**ORIGINAL**

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Luis A. Feldstein, State Bar No. 184824
lfeldstein@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile (949) 369-3701

Attorneys for Plaintiff/Realtor
UNDER SEAL A & B



FILED 2011 APR 20 AM 10:43 CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. SANTA ANA BY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNDER SEAL A & B,<br><br>    Plaintiff,<br><br>v.<br><br>UNDER SEAL C, D, E, F, and G,<br><br>    Defendants. | Civil Action No. CV11-03343 GAF (JCx)<br><br>**FILED *IN CAMERA* AND UNDER SEAL**<br>**DO NOT ENTER ON PACER**<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732**<br><br>**DO NOT ENTER ON PACER**<br>**DO NOT PLACE IN PRESS BOX** |

**FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)**



N/S 890 File on Demand

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Luis A. Feldstein, State Bar No. 184824
lfeldstein@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701

Attorneys for Plaintiff/Realtor
JOSÉ R. VALDEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JOSÉ R. VALDEZ,<br><br>Plaintiff,<br><br>v.<br><br>AVETA, INC.; MMM HEALTHCARE, INC.; PMC MEDICARE CHOICE, INC.; MSO OF PUERTO RICO, INC.; MMM HOLDINGS, INC.,<br><br>Defendants. | Civil Action No. CV11-03343 GAF (JCx)<br><br>**FILED *IN CAMERA* AND UNDER SEAL<br>DO NOT ENTER ON PACER**<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732

Plaintiff José R. ("Josh") Valdez ("Relator"), as *qui tam* relator on behalf United States of America, brings this action pursuant to 31 U.S.C. §§ 3729-3732 (the "False Claims Act") to recover all damages, penalties and other remedies available to the United

1

States and Valdez under the False Claims Act, and in support thereof would show the following:

## PARTIES

1. Plaintiff/Relator, José R. ("Josh") Valdez ("Valdez"), is a citizen of the United States and a resident of the State of California.

2. Defendant AVETA INC. ("Aveta") is incorporated under the laws of the State of Delaware, with its principal place of business in Fort Lee, New Jersey. Aveta regularly transacts business in the Central District of California through its own operations; through the activities of its President and Chief Executive Officer, Richard Shinto ("Shinto"), who resides within this District; and through the operations of its wholly owned subsidiary, North American Medical Management of California, Inc. ("NAMM-California"), which is incorporated under the laws of California and headquartered in Ontario, California. Aveta may be served through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808. Alternatively, Aveta may be served through Shinto, who resides at 18992 Montecito Drive, Yorba Linda, CA 92886.

3. Defendant MMM HEALTHCARE, INC. ("MMM") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. MMM regularly transacts business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District. MMM may be served through Shinto.

4. Defendant PMC MEDICARE CHOICE, INC. ("PMC") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. PMC regularly transacts business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District. PMC may be served through its registered agent, FGR Corporate Services, Inc., Calle Alda #1551, Suite 201, Urb. Caribe, San Juan, P.R. 00926-2709. Alternatively, PMC may be served through Shinto.

2

5. Defendant MSO OF PUERTO RICO, INC. ("MSO") is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. MSO regularly transacts business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District. MSO may be served through its resident agent, FGR Corporate Services, Inc., Scotiabank Plaza, Suite 700, 273 Avenida Ponce de León, San Juan, P.R. 00917. Alternatively, PMC may be served through Shinto.

6. Defendant MMM HOLDINGS, INC. ("MMM Holdings") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. MMM Holdings regularly transacts business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District. MMM Holdings may be served through Carlos Vivaldi, its Chief Financial Officer, at 350 Torre Chardón, Suite 500, San Juan, P.R. 00918-2123. Alternatively, MMM Holdings may be served through Shinto.

## JURISDICTION AND VENUE

7. Jurisdiction over this action properly lies in the U.S. District Court for the Central District of California pursuant to the False Claims Act, 31 U.S.C. §§ 3730(b)(1) and 3732(a), because Relator's claims seek remedies on behalf of the United States for Defendants' multiple violations of 31 U.S.C. § 3729 and because at least one Defendant, Aveta, transacts business within this District.

8. Venue is proper in the U.S. District Court for the Central District of California pursuant to 31 U.S.C. §§ 3730(b)(1) and 3732(a) because all Defendants regularly transact business within this District through Shinto, their Chief Executive Officer, and further because Aveta regularly transacts business within this District through its own operations and the operations of NAMM.

## FACTUAL ALLEGATIONS

### OVERVIEW

9. This lawsuit concerns rampant fraud perpetrated by the Defendants against the federal Medicare program ("Medicare") over a period of several years through the knowing submission, concealment, and/or failure to correct member-related risk adjustment data that improperly inflated the amounts paid to the Defendants by hundreds of millions of dollars per year.

10. Beginning at least in January 2007 and continuing at least through December 13, 2010 (the "Relevant Period"), the Defendants knowingly overstated, and/or concealed and failed to correct their overstatements of, risk adjustment scores submitted to the Centers for Medicare & Medicaid Services ("CMS") for purposes of calculating the monthly government payments made to Defendant Aveta's two Medicare Advantage plans in Puerto Rico, Defendants MMM and PMC (the "Plans"). By submitting inflated risk-adjustment scores for each Plan member, the Defendants caused CMS to assign higher multipliers – known as risk adjustment factors – to the Plans that resulted in much higher government payments than the Plans were entitled to receive.

11. In so doing, the Defendants knowingly presented or caused to be presented false or fraudulent claims to CMS for payment or approval, and knowingly made, used, or caused to be made or used false records or statements to CMS for payment or approval of false claims. The risk adjustment scores were false or fraudulent because they were based on diagnosis codes that were not substantiated by the medical records or by the medical conditions of the Medicare beneficiaries served by the Plans.

12. Valdez is informed and believes that Aveta collected as much as $350 million per year in improperly inflated payments from CMS based on the falsely inflated risk adjustment scores submitted by the Defendants.

13. Throughout the eight months he served as President of Defendant MSO, Valdez repeatedly asked questions, marshaled evidence, and spoke out against the Defendants' overbilling practices and other violations of law. On December 13, 2010,

4

Valdez's employment was terminated, without cause or warning, in retaliation for his outspoken opposition to these illegal practices. Defendants refused to pay him the severance he was due under his employment agreement with MSO unless he signed an agreement releasing claims against all Defendants and their affiliates and agreeing not to sue or make negative comments about them, which Valdez refused to sign.

## BACKGROUND

14. Aveta, which has more than $2.3 billion in annual revenues, is one of the largest providers of managed health-care services in the United States. Aveta coordinates care for more than 230,000 Medicare beneficiaries and more than 300,000 commercial members through its wholly owned subsidiaries in Puerto Rico, California and Illinois.

15. Two of Aveta's subsidiaries, Defendants MMM and PMC (the "Plans"), operate Medicare Advantage plans in Puerto Rico that account for more than 185,000 – or about 80 percent – of the Medicare beneficiaries served by Aveta. MMM is the largest of the two Plans with more than 130,000 members.

16. Through the Plans, Aveta contracts with the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services ("HHS"), to provide its Medicare Advantage services in return for monthly capitated (*i.e.,* per-person) payments from CMS designed to cover the Plans' costs up to a regional maximum.

17. The Plans consistently receive payments exceeding the regional maximum, however, by submitting "risk adjustment" scores to CMS that purport to reflect the most serious health conditions with which each Plan member has been diagnosed over the preceding year. Based on these individual risk scores, CMS assigns an overall risk adjustment factor to each Plan that serves as a multiplier in calculating the capitation payment rate for each Plan.

18. Generally, Plan members who are in poorer health – and presumably more costly to treat – receive higher risk scores and generate higher risk-adjusted payments for the Plans than do healthier members.

# FALSE CLAIMS ACT

19. This is an action by Valdez, as *qui tam* Relator, to recover damages and civil penalties on behalf of the United States and himself arising from the false claims and statements made by the Defendants in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-3732.

20. The False Claims Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the United States for payment or approval, or who makes or causes to be made a false statement or record in connection with such a claim, is liable to the federal government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the government because of the false claim or statement.

21. CMS made risk-adjusted payments to the Plans totaling approximately $1.5 billion in 2008 and approximately $1.8 billion in 2009 and 2010, respectively. Valdez is informed and believes that CMS paid the Plans a total of no less than $1 billion in 2007.

22. During the Relevant Period, the Defendants sought to maximize the payments they received from CMS by focusing their marketing efforts on attracting chronically ill members whose health conditions would generate the highest risk adjustment factors ("RAF"). In a Form S-1/A Registration Statement filed with the Securities and Exchange Commission in June 2006, Aveta emphasized the importance of RAFs to the company's strategy for maximizing revenues from CMS:

> [U]nder … the risk adjustment formula, health plans are paid higher premiums to care for chronically ill Medicare beneficiaries in recognition of the increased costs associated with the care of these beneficiaries. We believe that the implementation of Medicare's risk adjustment formula … will provide a significant opportunity for Medicare Advantage companies like ours that can effectively serve these chronically ill populations.
> We focus on the treatment of the chronically ill segment of the Medicare population…. Under Medicare's risk adjustment formula…, health plans are paid greater premiums to care for chronically ill beneficiaries in recognition of the increased costs associated with the care of these beneficiaries. We estimate that payments to health plans in respect of approximately 50% of Medicare beneficiaries would reflect these higher premiums…. We believe that the full implementation of Medicare's risk adjustment formula will provide a significant opportunity for Medicare Advantage plans that can effectively manage these chronically ill populations…. We believe that our understanding of the regulatory environment

6

allowed us to quickly recognize the economic implications of the risk-adjusted reimbursement methodology and to rapidly adjust our strategy in order to focus on chronically ill Medicare beneficiaries....

[A] change in the risk adjustment payment system for Medicare health plans (the current payment system that pays health plans higher premiums for members likely to require more care than average Medicare beneficiaries based upon historical medical diagnoses), or a change that reduces payments or benefits for the chronically ill population could adversely affect our revenue and profitability.

23. Throughout the Relevant Period, the Defendants sought to falsely inflate the RAFs assigned to the Plans by submitting diagnosis codes – known as ICD-9-CM codes – to CMS that were not supported by the underlying medical records or by the actual medical conditions of Plan members.

24. The Defendants' submissions of incomplete and/or erroneous risk adjustment data to CMS, in addition to their knowing concealment and failure to correct such data, damaged the United States by causing it to pay hundreds of millions of dollars more to the Plans during the Relevant Period than they were entitled to receive.

25. In numerous internal meetings of the Defendants' senior management, Aveta executives estimated that the Plans' potential liability to CMS ranged between $300 million and $350 million per year from 2007 to 2010.

26. The risk adjustment data submitted to CMS was based on Medical Status Visit ("MSV") forms purportedly generated by medical providers and submitted to the Plans in connection with each member visit. The MSV forms were the primary tool used by the Plans to generate the ICD-9-CM diagnosis codes ultimately submitted to CMS for purposes of calculating the RAFs on which payments were based.

27. In a Spanish-language newsletter to providers that is undated but appears to have been circulated in mid-2008, the Plans described MSV forms as the primary means of gathering "crucial patient information" that "allows for the identification of high risk members and the creation of specialized programs through the identification of areas of opportunity. Another added benefit of the MSV for the provider is the maximization of the RAF (Risk Adjustment Factor) of the member." The same message to providers was displayed on MMM's website as recently as late March 2011.

28. Each time the Plans submitted diagnosis codes to CMS, CMS was not in a position to verify the codes' accuracy because CMS did not require the Plans to submit supporting documentation with the codes. Instead, CMS relied on the Plans to submit medically supported diagnoses in the first instance and to delete any diagnoses that the Plans later determined were unsupported by the underlying medical records.

29. The Plans' contracts with their medical providers created incentives for the providers to inflate the ICD-9-CM codes that they recorded for Plan members. Throughout the Relevant Period, Plan providers that were organized as Independent Practice Associations ("IPAs") maintained profit-sharing arrangements with the Plans pursuant to which each IPA received 50% to 60% of the "surplus" (*i.e.,* profit) earned by the Plans on that IPA's member services. Despite this built-in incentive for IPAs to inflate diagnosis codes, the Defendants knowingly failed to take corrective measures to delete or filter out inaccurate risk adjustment data submitted to CMS or to otherwise ensure the integrity of the data submitted to CMS. They also knowingly failed to take any steps to correct the risk adjustment data submitted to CMS after learning that the data was inaccurate.

30. In a subsequent Spanish-language newsletter to providers dated March 2009, the Plans reported that a recent CMS audit (presumably involving other Medicare Advantage plans) had found that "a significant percentage of medical records did not comply with basic documentation requirements." The newsletter explained: "Said files did not validate the diagnoses recorded in the MSVs. Many doctors limited themselves to documenting diagnoses and medications without justifying the need for the same."

31. Valdez was hired on April 1, 2010, as President of MSO. Between April 1 and April 16, 2010, Valdez received training in Ontario, California, focusing on the business operations of NAMM-California, Aveta's subsidiary in California. During the training, a NAMM employee asked Valdez whether he was aware of the "MSV issue" in Puerto Rico. Valdez said he was not, and his efforts to learn about the issue were unsuccessful.

8

32. Shortly after he reported for work at MSO's Puerto Rico headquarters on April 19, 2010, Valdez discovered that the "MSV issue" referred to by the employee was the Defendants' practice of overcharging CMS based on inflated risk adjustment scores. Valdez spoke out repeatedly against this practice during his eight months at MSO until he was fired in December 2010 by Richard Shinto, the Chief Executive Officer of all five Defendants, for refusing to drop his objections.

33. In April 2010, senior executives of all five Defendants met to discuss the Plans' exposure in the event of a CMS audit of the Plans' RAFs over the previous three years. The executives agreed to develop a strategy for dealing with such an audit if it were to occur.

34. In May 2010, Shinto informed Valdez that an internal audit of MSV forms (the "Internal Audit") had discovered a substantial discrepancy between the risk adjustment data reported to CMS and the underlying medical records maintained by Plan providers. Shinto stated that only 33 percent of the audited MSV forms were accurate, while the other 67% lacked adequate support in the medical records.

35. The audit findings led to a series of discussions among the Defendants' senior executives about the need to establish a reserve (the "RAF Reserve") to cover the liability that could result if CMS audited the risk-adjustment data submitted by the Plans and discovered hundreds of millions of dollars in overpayments by CMS. Orlando González, the President of MMM and PMC, was among those who favored creating an RAF Reserve sufficient to cover the liability that could result from a CMS audit.

36. In July 2010, senior executives of all five Defendants met to discuss the Internal Audit and the need for the RAF Reserve. Penelope Kokkinides, the Chief Operating Officer of Aveta, stated that an aggressive RAF strategy remained the key to maximizing payments from the government, but that based on the Internal Audit, inflated RAFs were resulting in substantial overcharges to the government based on diagnosis codes that were not supported by the underlying medical records.

37. Kokkinides stated at the meeting that 97% of the Plans' providers were non-compliant with CMS standards. She stated that the Defendants would be "screwed" if CMS audited the Plans, particularly if such an audit reached back to 2007 because Plan overcharges to CMS were particularly egregious that year. Kokkinides also stated that the Plans' exposure to the federal government could be as high as 20% of total revenue, which she stated was approximately $350 million per year.

38. Valdez is informed and believes that the Plans' RAFs during the Relevant Period were substantially higher than those of other Medicare Advantage plans serving demographically and diagnostically similar populations in Puerto Rico, in addition to comparable Medicare Advantage plans nationwide. In 2009, for example, the Plans' RAFs were approximately 1.39, while the RAF for MCS Advantage, a competing Medicare Advantage plan in Puerto Rico whose members had similar demographic and diagnostic characteristics, was approximately 1.10.

39. In a meeting in late July 2010, senior executives of the five Defendants decided to withhold $21 million per quarter from future surplus payments made to the IPAs under their profit-sharing arrangements with the Plans, and to place those funds in the RAF Reserve. Under this plan, the IPAs would contribute $84 million per year – almost their entire share of the surplus for 2009 – to the RAF Reserve. It was decided not to seek disgorgement of previous surplus payments made to the IPAs for fear that such a request would cause providers to leave the Plans.

40. In August 2010, Doug Malton, the Chief Executive Officer of Aveta, told Valdez and others that the Plans should reserve $27 million from the next quarterly profit-sharing payment to the IPAs and $5 million per quarter thereafter. While the IPAs' proportional share of the surplus resulting from improperly obtained CMS payments was significantly higher, Aveta executives were still concerned that IPAs might defect to competing plans if asked to pay more into the RAF Reserve.

41. The IPAs were informed of the decision at a meeting of the MSO Advisory Board – a group of IPA representatives and Aveta executives – in early August 2010.

Carlos Vivaldi, Chief Financial Officer of MMM Holdings, told the IPAs that the inflated RAFs submitted to CMS had resulted in approximately $300 million per year in unsubstantiated payments to the Plans. He stated that a portion of future profit-sharing payments to IPAs would have to be withheld to fund the RAF Reserve.

42. At the same time that the Defendants were requiring the IPAs to contribute millions of dollars to the RAF Reserve, they were telling the IPAs that the Defendants would contribute substantially more to the Reserve.

43. In December 2010, Aveta announced that it was increasing its loan facilities by $100 million and using the entire proceeds to pay a dividend to Aveta shareholders, the largest of whom was founder and Chairman Daniel E. Straus. Valdez objected to paying the dividend while the Defendants' potential liability to the government for RAF overcharges remained unaddressed.

44. On December 13, 2010, less than one week after the dividend was announced, Shinto terminated Valdez's employment without cause or warning.

45. Throughout Valdez's eight months as MSO President, Defendants gave no indication that they would delete or correct the inflated risk adjustment data submitted to CMS, either prospectively or retrospectively. Nor did the Defendants give any indication that they would notify CMS of the problem or return the improperly obtained funds to the government.

46. In fact, the Defendants engaged in further wrongful conduct to maximize their gains from the RAF overcharges. For example, Defendants decided not to pay approximately $50 million owed to medical specialists as a result of government-mandated increases in the Medicare fee schedule that took effect in 2010. Shinto went to unusual lengths to keep the decision a closely guarded secret, at one point instructing senior executives not to copy their subordinates on any e-mails referring to the decision.

47. In November 2010, Shinto further directed his subordinates to stop making federally required payments to non-Plan providers for such services as emergency room

11

treatment. Valdez's termination by Shinto occurred a few weeks after he refused to carry out this instruction.

48. Subsequent to Valdez's termination, Defendants Aveta and MSO refused to pay him the severance to which he was entitled under his employment agreement with MSO unless he signed a general release of claims against the Defendants and their affiliates, agreed not to sue Defendants or their affiliates, and agreed not to make any negative comments about them or their business operations. Valdez did not sign the release and Defendants have not paid him the severance due under the employment agreement.

49. Valdez's termination was in retaliation for his repeated, outspoken and lawful opposition to (i) Defendants' submission, concealment and refusal to correct inflated RAFs; (ii) Defendants' decision to make only partial payments of certain of their obligations to Plan providers; and (iii) Defendants' decision to stop making federally required payments to non-Plan providers.

50. On or about December 13, 2010, persons acting at the direction of one or more Defendants deleted most of the e-mails and attached documents relating to the RAF inflation issue from Valdez's company laptop without Valdez's knowledge or consent.

51. As recently as late March 2011, persons acting at the direction of the Defendants contacted Valdez's friends and relatives to warn them that the Defendants were watching Valdez "like a hawk" and that disclosure of Valdez's allegations could cost the Defendants more than $300 million.

52. On March 30, 2011, pursuant to 31 U.S.C. §§ 3730(e)(4)(B) and 3730 (b)(2), Valdez provided the Attorney General of the United States and the United States Attorney for the Central District of California with written disclosure of all material evidence and information related to this complaint of which Valdez is currently aware. That disclosure statement was accompanied by numerous exhibits of documentary evidence.

## CAUSES OF ACTION

### COUNT I: FALSE CLAIMS (31 U.S.C. § 3729)
(Against all Defendants)

53. Valdez realleges and hereby incorporates by reference every allegation set forth in paragraphs 1 through 52 of this complaint.

54. Through the acts described above, the Defendants knowingly violated the False Claims Act through one or more of the following:

   a. Knowingly presenting, or causing to be presented, to an officer or employee of the United States government a false or fraudulent claim for payment or approval;

   b. Knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States government;

   c. Conspiring to defraud the government by getting a false or fraudulent claim allowed or paid; and/or

   d. Knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States government.

55. The United States government was unaware of the falsity of these claims, records and/or statements made by the Defendants and, in reliance on the accuracy thereof, paid the Defendants for the claims.

56. Due to the Defendants' conduct, the United States has suffered substantial monetary damages.

### COUNT II: RETALIATORY DISCHARGE (31 U.S.C. § 3730(h))
(Against Defendants Aveta and MSO)

57. Valdez realleges and hereby incorporates by reference every allegation set forth in paragraphs 1 through 56 of this complaint.

58. By terminating Valdez's employment after only eight months without cause or warning, Defendants Aveta and MSO retaliated against him for repeatedly and lawfully asking questions, marshaling evidence, and speaking out against the Defendants'

overbilling practices and other violations of law in furtherance of the relief sought in this complaint.

59. After he was terminated, Defendants refused to pay Valdez the severance he was due under his employment agreement with MSO unless he signed an agreement releasing claims against all Defendants and their affiliates and agreeing not to sue or make negative comments about them, which Valdez refused to sign.

60. Due to the above-described conduct by Aveta and MSO, Valdez has suffered substantial damages.

## RELIEF

1. On behalf of the United States, Valdez seeks monetary damages equal to three (3) times that suffered by the United States as a result of Defendants' violations of the False Claims Act. In addition, Valdez seeks all civil penalties on behalf of the United States in accordance with the False Claims Act.

2. As the *qui tam* Relator, Valdez seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d).

3. As the *qui tam* Relator, Valdez seeks to be awarded all expenses, fees and costs incurred in this action, including attorney's fees and court costs, pursuant to 31 U.S.C. § 3730(d).

4. In his personal capacity, Valdez seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(h), including special damages, litigation costs and attorney's fees.

5. Valdez seeks prejudgment interest for himself and for the United States at the highest rate allowed by law.

# PRAYER

WHEREFORE, Valdez prays that this Court enter judgment on behalf of the United States and against the Defendants awarding:

a. To the United States, damages in the amount of three (3) times the actual damages sustained by the United States as a result of the Defendants' violations of the False Claims Act;

b. To the United States, civil penalties against the Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

c. To Valdez, the maximum allowed pursuant to 31 U.S.C. § 3730(d);

d. To Valdez, all expenses, fees and costs incurred in this action, including attorney's fees and costs;

e. To Valdez, the maximum allowed pursuant to 31 U.S.C. § 3730(h), including special damages, litigation costs and attorney's fees;

f. To Valdez and the United States, prejudgment interest at the highest rate allowed by law; and

g. To Valdez and the United States, all other relief to which they may be entitled and that the Court deems just and proper.

Dated: April 20, 2011

Respectfully submitted,

BIENERT, MILLER & KATZMAN, PLC

By: _____
Thomas H. Bienert, Jr.
Luis A. Feldstein
Attorneys for Plaintiff/Realtor
JOSÉ R. VALDEZ