1 Thomas H. Bienert, Jr., State Bar No. 135311
 tbienert@bmkattorneys.com
2 BIENERT, MILLER & KATZMAN, PLC
3 903 Calle Amanecer, Suite 350
 San Clemente, California 92673
4 Telephone (949) 369-3700/Facsimile (949) 369-3701

5 Marc G. Reich, State Bar No. 159936
6 mgr@reichradcliffe.com
 REICH RADCLIFFE & KUTTLER LLP
7 4675 MacArthur Ct, Suite 550
8 Newport Beach, CA 92660
 Telephone (949) 975-0512/Facsimile (949) 975-0514
9
10 Attorneys for Plaintiff/Realtor
 JOSÉ R. VALDEZ
11

12 IN THE UNITED STATES DISTRICT COURT

13 FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14 UNITED STATES OF AMERICA *ex rel*. JOSÉ R. VALDEZ, | Case No. CV11-03343 GAF (JCx) |
| 15 | |
| 16     Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732** |
| 17 v. | |
| 18 | |
| 19 AVETA, INC.; MMM HEALTHCARE, INC.; PMC MEDICARE CHOICE, INC.; | **JURY TRIAL DEMANDED** |
| 20 MSO OF PUERTO RICO, INC.; MMM HOLDINGS, INC.; and RICHARD | |
| 21 SHINTO, | |
| 22 | |
| 23     Defendants. | |

24

25     Plaintiff José R. ("Josh") Valdez ("Relator"), as qui tam relator on behalf United

26 States of America, brings this action pursuant to 31 U.S.C. §§ 3729-3732 (the "False Claims

27

28

PLAINTIFF'S FIRST AMENDED COMPLAINT

Act") to recover all damages, penalties and other remedies available to the United States and Valdez under the False Claims Act, and in support thereof would show the following:

**PARTIES**

1.      Plaintiff/Relator, José R. ("Josh") Valdez ("Valdez"), is a citizen of the United States and a resident of the State of California.

2.      Defendant AVETA INC. ("Aveta") is incorporated under the laws of the State of Delaware, with its principal place of business in Fort Lee, New Jersey.  During the relevant time period, Aveta regularly transacted business in the Central District of California through its own operations; through the activities of its President and Chief Executive Officer, Richard Shinto ("Shinto"), who resides within this District; and through the operations of its wholly owned subsidiary, North American Medical Management of California, Inc. ("NAMM-California"), which was incorporated under the laws of California and headquartered in Ontario, California.

3.      Defendant MMM HEALTHCARE, INC. ("MMM") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico.  During the relevant time period, MMM regularly transacted business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District.

4.      Defendant PMC MEDICARE CHOICE, INC. ("PMC") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico.  During the relevant time period, PMC regularly transacted business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District.

5.      Defendant MSO OF PUERTO RICO, INC. ("MSO") is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico.  During the relevant time period, MSO regularly transacted business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District.

PLAINTIFF'S FIRST AMENDED COMPLAINT

6. Defendant MMM HOLDINGS, INC. ("MMM Holdings") is a corporation incorporated under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. During the relevant time period, MMM Holdings regularly transacted business in the Central District of California through the activities of its Chief Executive Officer, Shinto, who resides within this District.

7. Defendant Richard Shinto ("Shinto") is the President and Chief Executive Officer of Defendant Aveta and the Chief Executive Officer of Defendants MMM, PMC, and MSO. Shinto also has been the Chief Executive Officer of NAMM-California since 2003. Upon information and belief, Shinto at all times relevant has resided in this District.

8. Defendant MMM Holdings is a wholly owned subsidiary of Defendant Aveta and is the parent holding company of Defendants MMM, PMC, and MSO. During the relevant time period Aveta, MMM Holdings, MMM, PMC, and MSO were under the day-to-day operational control of their CEO, Defendant Shinto, who reported to Aveta's Board of Directors and the Board's Chairman, Defendant Daniel Straus. Defendants Aveta, MMM Holdings, MMM, PMC, and MSO are collectively referred to as the Entity Defendants. Valdez was the President for MSO from approximately April 1, 2010 until December 13, 2010.

## JURISDICTION AND VENUE

9. Jurisdiction over this action properly lies in the U.S. District Court for the Central District of California pursuant to the False Claims Act, 31 U.S.C. §§ 3730(b)(1) and 3732(a), because Relator's claims seek remedies on behalf of the United States for Defendants' multiple violations of 31 U.S.C. § 3729 and because during the relevant times all Defendants regularly transacted business within this District through Shinto, and further because Aveta regularly transacted business within this District through its own operations and the operations of NAMM.

10. Venue is proper in the U.S. District Court for the Central District of California pursuant to 31 U.S.C. §§ 3730(b)(1) and 3732(a) because one or more of the Defendants

///

can be found, resides, or transacts business in this District, and because multiple of the acts and omissions upon which this action is based occurred in this District.

## FACTUAL ALLEGATIONS

### OVERVIEW

11.    This lawsuit concerns rampant fraud perpetrated by the Defendants against the federal Medicare program ("Medicare") since at least 2007 through the knowing submission of inaccurate, incomplete, and untruthful data that the federal government used to determine the amounts of money paid to MMM and PMC, and by failing to inform the federal government that MMM and PMC had received overpayments as Defendants well knew.

12.    Beginning at least in January 2007 and continuing through **at least January 2012** (the "Relevant Period"), the Defendants knowingly overstated, and/or concealed and failed to advise of and correct, their unsupported reports of ICD-9 codes, which caused overstatements of risk adjustment scores used by the Centers for Medicare & Medicaid Services ("CMS") for purposes of calculating the monthly government payments made to Defendant Aveta's two Medicare Advantage plans in Puerto Rico, Defendants MMM and PMC (the "Plans").  By submitting unsupported, inaccurate or incomplete ICD-9 codes for the Plans' members (insureds), the Defendants caused CMS to assign higher multipliers – known as risk adjustment factors ("RAF") – to the Plans' members that resulted in much higher government payments than the Plans were entitled to receive.

13.    In so doing, the Defendants knowingly presented or caused to be presented inaccurate, incomplete, false, or fraudulent claims to CMS for payment or approval, and knowingly made, used, or caused to be made or used false records or statements to CMS for payment or approval of false claims.  The resulting risk adjustment scores were inflated because they were based on diagnosis codes that were not substantiated by the medical records of the Medicare beneficiaries served by the Plans.  In addition to submitting diagnosis codes that were not substantiated by the medical records, Defendants failed to delete or correct previously submitted diagnosis codes that internal audits , external, and

chart reviews revealed lacked adequate support in their corresponding medical charts. In other words, in addition to knowingly submitting erroneous data (inflated diagnoses codes) that they knew would result in higher RAFs and therefore higher capitated payments from CMS, Defendants also failed to delete or correct inflated codes that they previously had submitted because doing so would have resulted in lower RAFs and therefore lower capitated payments from CMS. Lastly, Defendants failed to advise CMS that they had received overpayments.

14.     Defendants collected hundreds of millions of dollars per year in improperly inflated payments from CMS based on the falsely inflated diagnoses codes they submitted to CMS. After Defendants received these inflated payments, they conducted internal accuracy reviews and audits that revealed the overpayments. Not only did Defendants fail to advise CMS that they had received the overpayments, but, on information and belief, they subsequently submitted false attestations that all risk adjustment date previously submitted to CMS was "accurate, complete, and truthful."

15.     Throughout the eight months he served as President of Defendant MSO, Valdez repeatedly questioned, and spoke out against the Defendants' overbilling practices and other violations of law. On December 13, 2010, Defendants terminated Valdez's employment, without cause or warning, in retaliation for his outspoken opposition to these illegal practices. Defendants refused to pay him the severance he was due under his employment agreement with MSO unless he signed an agreement releasing claims against all Defendants and their affiliates and agreeing not to sue or make negative comments about them, which Valdez refused to sign.

BACKGROUND

16.     During the relevant time period, Aveta, which had more than $2.3 billion in annual revenues, was one of the largest providers of managed health-care services in the United States. Aveta coordinated care for more than 230,000 Medicare beneficiaries and more than 300,000 commercial members through its wholly owned subsidiaries in Puerto Rico, California, and Illinois.

PLAINTIFF'S FIRST AMENDED COMPLAINT

17.     Two of Aveta's subsidiaries, Defendants MMM and PMC, operate Medicare Advantage plans in Puerto Rico that serviced approximately 185,000 Medicare beneficiaries as of November 2010. MMM is the larger of the two Plans with more than 140,000 members. Defendant MSO provides management and administrative support for the Plans.

18.     The Medicare Advantage Program allows private health plans, including Defendants, to act as administrators for the U.S. Government in handling Medicare benefits. A private health plan that acts in this capacity is known as a Medicare Advantage Organization ("MAO"). Under Medicare Advantage, Medicare enrollees receive their Medicare benefits from the MAO.

19.     Each month, the government, through CMS, pays the MAO a monthly payment based on applying a "risk adjustment factor" ("RAF") to a "capitated" amount for each patient in the MAO. CMS arrives at the RAF for each patient in an MAO based on "ICD-9" codes provided by the MAO for the previous year. ICD-9 codes are supposed to correspond to the medical condition of a particular MAO's patient as reflected in the appropriate medical record documentation for that patient. Generally speaking, the more serious the patient's condition, the higher the payment value of the ICD-9 code associated with that condition. CMS requires that the assignment of an ICD-9 Code must be based on a face-to-face meeting between the medical provider and the patient.

20.     The medical providers submit the ICD-9 codes to the MAOs. The MAOs in turn submit them to CMS. MAOs can electronically submit ICD-9 codes to CMS as frequently as daily in batches that contain large amounts of data relating to many enrollees. MAOs are also able to electronically delete and correct previously submitted diagnosis codes.

21.     MAO's are required to submit accurate data to CMS. MAOs attest when enrolling in the Medicare Advantage program that they will, to the best of their knowledge, information, and belief, submit risk adjustment data that is accurate, complete, and truthful.
///

Additionally, at least once a year, MAO's submit an Attestation of Risk Adjustment Data form acknowledging that:

    a.    information submitted directly affects the calculation of CMS payments to the MAO;

    b.    misrepresentation to CMS about the accuracy of such information may result in federal civil action and/or criminal prosecution;

    c.    the MAO has reported to CMS for the relevant period all risk adjustment data available to the MAO as of the date of the attestation; and,

    d.    based on best knowledge, information and belief, all information reported to CMS is accurate, complete and truthful.

<u>FALSE CLAIMS ACT</u>

22. The False Claims Act ("FCA") provides that any person or corporation that knowingly submits or causes to be submitted a false or fraudulent claim to the United States for payment or approval, or who makes or causes to be made a false statement or record in connection with such a claim, is liable to the federal government. The FCA, in conjunction with other laws, also makes liable any person or corporation that knowingly conceals or improperly avoids or decreases an obligation to pay or transmit money or property to the Government. An "obligation to pay" includes a duty to pay the government arising "from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). A person acts "knowingly" with respect to information if he has actual knowledge of the information, or if he acts in deliberate ignorance of, or in reckless disregard of, the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A).

23. The Patient Protection and Affordable Care Act ("ACA") imposes a 60-day deadline for companies to refund overpayments of Medicare and Medicaid funds. Specifically, section 6402(a) of the ACA, codified at section 1128J of the Social Security Act ("SSA"), requires companies to report and return Medicare or Medicaid overpayments by the later of (1) 60 days after the overpayment has been identified, or (2) the date any corresponding cost report is due. 42 U.S.C. § 1320a–7k(d)(2). Any overpayment retained

beyond that deadline constitutes an "obligation" that gives rise to FCA liability. FCA § 3729(b)(3); SSA § 1128J(d)(3). Moreover, section 6402(a) applies to Medicare Advantage organizations such as Defendants. SSA § 1128J(d)(4)(C).

24.     The FCA also prohibits a person or entity from retaliating against someone who speaks out against that person or entity's fraud against the government. 31 U.S.C. § 3730(h).

25.     A Defendant that violates the FCA is liable to the federal government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the government because of the false claim or statement. A Defendant who retaliates against the whistleblower is liable to the whistleblower for double back pay, interest, special damages sustained as a result of retaliation, and attorneys' fees and costs

## DEFENDANTS' WRONGDOING

26.     CMS paid the Plans approximately $1.5 billion in 2008 and approximately $1.8 billion in 2009 and 2010, respectively. Valdez is informed and believes that CMS paid the Plans a total of no less than $1 billion in 2007.

27.     Throughout the Relevant Period, the Defendants sought to falsely inflate the RAFs assigned by CMS to Plan members by submitting ICD-9 codes to CMS that were not supported by the underlying medical records or conditions of Plan members and by failing to correct and/or delete previously submitted diagnosis codes after Defendants learned that they were not supported by the corresponding medical records.

28.     The Defendants' submissions of unsupported diagnosis codes to CMS, in addition to their knowing concealment and failure to correct such data, damaged the United States by causing it to pay hundreds of millions of dollars more to the Plans during the Relevant Period than they were entitled to receive.

29.     During Valdez's tenure with Defendants, in numerous internal meetings of the Defendants' senior executives, they estimated that the Plans' potential liability to CMS ranged between $300 million and $350 million per year from 2007 to 2010.

PLAINTIFF'S FIRST AMENDED COMPLAINT

30.   The ICD-9 codes Defendants submitted to CMS were based on the ICD-9 codes contained in Medical Status Visit ("MSV") forms purportedly generated by the Plans' medical providers and submitted to the Plans by the providers in connection with each member visit to the provider.  CMS calculated the RAF for each member based on the ICD-9s submitted by the Plans for that member for the prior year.

31.   In a Spanish-language newsletter to providers that is undated but appears to have been circulated in mid-2008, the Plans described MSV forms as the primary means of gathering "crucial patient information" that "allows for the identification of high risk members and the creation of specialized programs through the identification of areas of opportunity.  Another added benefit is the maximization of the RAF (Risk Adjustment Factor) of the member."[1]  The same message to providers was displayed on MMM's website as recently as late March 2011.

32.   Each time the Plans submitted diagnosis codes to CMS, CMS could not verify the codes' accuracy because CMS did not require the Plans to submit supporting documentation with the codes.  Instead, CMS relied on the Plans to submit medically supported diagnoses in the first instance and to delete and/or correct any diagnose codes that the Plans later determined were unsupported by the underlying MSV's and records..

33.   The Plans' contracts with many of their medical providers created incentives for the providers to inflate the ICD-9 codes that they recorded for Plan members.  Throughout the Relevant Period, certain Plan providers that were organized as Independent Practice Associations ("IPAs") maintained profit-sharing arrangements with the Plans pursuant to which each IPA received 50% to 60% of the "surplus" (*i.e.*, profit) earned by the Plans on that IPA's member services.  For 2009, Defendants paid IPAs $83.2 million in "surplus" payments.  Despite this built-in incentive for IPAs to inflate diagnosis codes, the Defendants knowingly failed to take corrective measures to delete or filter out inaccurate

---

[1] The reason that high RAFs benefit providers is that the Plans had a profit sharing arrangement with many of its providers.  Thus, higher RAFs meant higher profits for the providers.

risk adjustment data initially submitted to CMS or to otherwise ensure the integrity of the data initially submitted to CMS. Quite the opposite, Defendant actively encouraged providers to inflate diagnosis codes. Defendants also knowingly failed to correct the risk adjustment data previously submitted to CMS after learning that the data was not supported by the corresponding medical charts.

34.     Valdez was hired on April 1, 2010, as President of MSO. Between April 1 and April 16, 2010, Valdez received training in Ontario, California, focusing on the business operations of NAMM-California, Aveta's subsidiary in California. During the training, a NAMM employee asked Valdez whether he was aware of the "MSV issue" in Puerto Rico. Valdez said he was not, and his efforts to learn about the issue at that time were unsuccessful.

35.     Shortly after he reported for work at MSO's Puerto Rico headquarters on April 19, 2010, Valdez discovered that the "MSV issue" referred to by the employee was the Defendants' practice of overcharging CMS based on the submission of and failure to correct unsupported diagnosis codes (codes not supported by the corresponding medical record). Defendants knew that a significant percentage of the MSV forms in their insureds' files did not support the ICD-9 codes submitted to CMS and used to calculate the RAF scores. Defendants' knowledge of this fact, and matters attendant to it, were a constant area of focus for the entirety of Valdez's tenure at MSO. After only 8 months at MSO, Valdez was terminated in December 2010 by Richard Shinto, the Chief Executive Officer of all five Entity Defendants, for continuing to question Defendants' inappropriate practices.

36.     In addition to over-charging and failing to notify CMS they had received overpayments, Defendants committed other wrongdoing to retain these funds by (a) not paying fee for service doctors Medicare fee increases in 2010, (b) not paying out-of-plan doctors for emergency related services (referred to in the industry as Non-Par Payments), and (c) retaliating against providers for providing expensive medical care. Valdez was fired for also complaining to Defendants about these additional areas of wrongdoing.

///

37.     Upon beginning work for Defendants in April 2010, Valdez was provided an MMM 2010 Business Plan.  Among the identified goals for 2010 were to ensure RAF and MSV accuracy, using internal and external audits to assess their accuracy.  Another goal was to "Effectively Manage Health Care Cost and Quality" by reducing the length of "bed days" of members, decreasing ER visits in acute hospitals by 10 percent, and decreasing ambulatory services by 10 percent.  On April 23, 2010, Valdez attended a Finance Meeting with Defendants' senior executives.  The April 23, 2010 Finance Meeting included a directive to reduce the number of referrals to fee-for-service specialists in the areas of cardiology, ophthalmology, pulmonology, orthopedics, and gastroenterology.[2]

38.     Another agenda item for the April 23 meeting was providing for a "possible CMS RAF Audit."

39.     At the conclusion of the April 23 Finance Meeting, MSO determined to incorporate changes to Defendants' compensation agreements with IPAs to more closely tie IPAs' compensation to Defendants' profitability, and to provide for recoveries from the IPAs should Defendants have to repay funds to CMS caused by a failure by the IPA's records to adequately support the IDC-9 codes.

40.     The initiative referenced as part of the April 23 meeting included the reviews and audits of the medical charts of hundreds of thousands of files corresponding to diagnosis codes Defendants had already submitted to CMS (the "Chart Review Initiative"). These reviews and audits were done both by Defendants' internal Coding Unit and by a third party vendor called The Coding Source.  After receiving the results of these reviews and audits, Defendants cherry-picked those medical visits they believed supported higher billing codes, while ignoring the charts that corresponded to unsupported and inaccurate codes that should

---

[2] At the same time Defendants sought to get more funds from CMS, Defendants sought to keep more of the CMS funds by reducing the number of referrals to specialists.  Under the Medicare Advantage program, Defendants are expected to pay for all medical care for enrollees, including those needing services of medical specialists who were not covered by Defendants' capitated payment agreements with their PCPs (Primary Care Physicians). Thus, when a PCP referred an enrollee to a specialist, Defendants incurred the additional expense of paying the specialist.

have not been reported or should have been lower than reported to CMS.  Defendants thereafter resubmitted corrected or additional codes for the cherry-picked charts to CMS for additional compensation.  Despite their obligation to be "accurate, complete, and truthful" with CMS, Defendants did not correct or inform CMS of previously submitted codes that were inaccurate, invalid, and unsupported by medical records and which had resulted or would result in overpayments by CMS.

41.  Defendants carefully monitored the results of the Chart Review Initiative. They tracked the reviews and audits in a "Coding Unit Monthly Report" (the "Monthly Report"), which provided significant detail about the ongoing efforts for the year to collect and review medical files, MSVs, and ICD-9s, as well as the financial impact of resubmitting data to CMS.  The Monthly Review was revised with additional data throughout the year and provided to Defendants' senior executives, including Defendant Shinto.

42.  The first part of the Monthly Report detailed "Compliance & Productivity" in several areas, including:

    a.    Progress of The Coding Source in conducting retroactive review of 140,000 calendar-year 2009 plan member charts and identifying "New Comp Codes" that could be submitted to CMS for additional payment.

    b.    Progress of Defendants' internal review and audit of 182,402 calendar-year 2010 MSVs.

    c.    Progress towards Defendants' goal in 2010 of performing in-house approximately 2,000 audits of calendar-year 2009 ICD-9's in order "to assure providers assessment documentation," as well as the Coding Source's retrospective medical chart review of 1,700 calendar-year 2009 plan member charts.

    d.    The Compliance & Productivity section of the Monthly Reports made clear to Defendants that very high percentages of the ICD-9 Codes they sent to CMS were non-compliant.

///

43. The second part of the Monthly Report contained information that told Defendants the "Financial Impact" of the Chart Review Initiative. In it, Defendants did the following:

      a.    Defendants kept track of actual and estimated additional revenue received and/or to be received from CMS by resubmitting changed and supplemental ICD-9 codes to CMS,

      b.    This section also kept track of the cost of doing the Chart Review Initiative, setting forth how much Defendants had to pay The Coding Source and the expenses related to internal employees doing the initiative.

      c.    The Financial Impact section reported Defendants' average RAF scores for each month, as calculated by CMS, as well as based on a general software program called MDX. The RAF that Defendants caused CMS to use was routinely 20 percent or so higher than the MDX calculation.

      d.    The "Financial Impact" section of the Monthly Report contained only entries and columns that kept track of "Revenue" to be earned from the Chart Review Initiative. Despite referencing that the reviews were to assure accuracy, Defendants did not keep track of the financial impact that would have resulted from non-compliant codes already sent to and used by CMS to increase RAF scores (and hence increase payments to Defendants). Defendants intended to have their cake and eat it too – keep funds previously received as overpayments from CMS and have CMS pay them additional money for charts they could now up-code to increase RAF scores.

44. The 60 day rule discussed previously, within which recipients of federal funds had to advise the government that they had received overpayment from the government, was enacted by Congress in March, 2010, Defendants were well aware of this new law. On April 29, 2010, Defendants' senior executives were sent an email entitled "Health Care

PLAINTIFF'S FIRST AMENDED COMPLAINT

Reform: Law Imposes Requirement to Report and Return Medicare and Medicaid Overpayments Within 60 Days."

45.    This new law created significant consternation among Defendants' senior executives.  In particular, they were concerned that the new law might lead to an increase in the number of audits by CMS.  In the months following the dissemination of the new law, Defendants' senior executives met to discuss the Plans' exposure in the event of a CMS Risk Adjustment Data Validation Audit ("RADV") of the Plans for the previous years.  They agreed to develop a strategy for dealing with the liability that would result if a CMS audit exposed the hundreds of millions of dollars in overpayments to Defendants.

46.    In May 2010, Shinto informed Valdez that an internal audit of MSV forms had discovered a substantial discrepancy between the ICD-9 codes reported to CMS and the underlying medical records maintained by Plan providers.  Shinto stated that only 33 percent of the audited MSV forms were accurate, while the other 67 percent lacked adequate support in the medical records.

47.    In May and June 2010, Defendants' senior executives exchanged numerous emails relating to MSV and RAF concerns and scenarios.

48.    On June 2, 2010, Defendants' senior executives met to further address MSV and RAF strategies.  Among the items covered at the meeting were:

     a.    Defendants' intent to have 100 percent MSV form review;

     b.    Defendants' concern that "MSV forms have yielded compliance of less than 50%";

     c.    Defendants' continuing audits, both internally and through outside vendor The Coding Source, to assess RAF;

     d.    the concern that the quality of RAF scores was low, with some reviews indicating only 33 percent of files supported the scores;

     e.    Defendants' concerns that CMS would penalize Defendants if it knew the true facts;

     f.    Defendants' desire to pass on any financial penalties for overpayment

to the IPAs and how to accomplish that;

g.    Creating a RAF Reserve sufficient to cover the liability that could result from a CMS audit; and

h.    the decision that "audit information will be reported to senior management and the board."

49.    On July 1, 2010, Defendants' senior executives met to further discuss the previous suggestion to create an RAF Reserve to have funds available in the event of a CMS audit. Penelope Kokkinides, Aveta's Chief Operating Officer, stated that an aggressive RAF strategy remained the key to maximizing payments from the government, but that the Plans had inflated RAFs, which were resulting in substantial overcharges to the government based on diagnosis codes that were not supported by the underlying medical records.

50.    Kokkinides stated at the meeting that the majority of the files were non-compliant and that as many as 97 percent of the Plans' providers could be non-compliant with CMS standards. She stated that the Defendants would be "screwed" if CMS audited the Plans, particularly if such an audit reached back to 2007 because Plan overcharges to CMS were particularly egregious that year. She also noted that 2009 was a risky year. Kokkinides stated that the Plans' exposure to the federal government could be as high as 20 percent of total revenue, which she stated was approximately $350 million per year. The executives expressed the desire to pass on to the IPAs their portions of the repayments to CMS should there be an audit (because the Plans paid the IPAs 50 to 60 percent of the Plans' profits attributable to the IPAs). The executives resolved that provision for this would be done by withholding funds from future "surplus" payments to the IPAs and putting them in a reserve fund.

51.    On July 1 or 8, 2010, Valdez attended a senior management meeting addressing various financial issues, including continuing concerns that Defendants could have to pay significant money to CMS because of RAF and MSV issues. Management noted at this meeting that The Coding Source was doing work for Defendants relative to RAF issues.

52. On July 9, 2010, Valdez met with Rick Shinto, who said in response to Valdez's questions that David Silva could explain why RAF scores were inflated. Despite several attempts by Valdez to schedule a meeting, Silva would not meet with Valdez. Silva's title was Coding Director for MMM Holdings, and it appears that he played a significant role in preparing the Monthly Reports.

53. On July 23, 2010, Penelope Kokkinides circulated an updated Monthly Report to senior management, advising them of the current status of the Chart Review Initiative. The Monthly Reports made clear to executives that very high percentages of Defendants' ICD-9 codes submitted to CMS were non-compliant.

54. In July 2010, Defendants' senior executives exchanged numerous emails about RADV audits and holdbacks from IPAs.

55. On July 22, 2010, Defendants held a senior executive management meeting to discuss, among other things, concerns about a possible risk score audit by CMS.

56. In a meeting in late July 2010, Defendants' senior executives decided to withhold $21 million per quarter from future surplus payments made to the IPAs under their profit-sharing arrangements with the Plans, and to place those funds in the RAF Reserve. Under this plan, the IPAs would contribute $84 million per year – which approximated their entire share of the surplus for 2009 – to the RAF Reserve. It was decided not to seek disgorgement of previous surplus payments made to the IPAs for fear that such a request would cause providers to leave the Plans.

57. In a July 30, 2010 email exchange following up on the decision to withhold from future surplus payments to IPAs, Rick Shinto directed that a meeting be held with "key people . . . to script our story so that we will not create confusion." Shinto cautioned that they "not stress how much we have paid out over the 3 years or we will have more problems," and that they "not go through the detail of financial exposure or we may have a lot of chismes."

58. On August 3, 2010, MSO AVP of Finance David Maldonado circulated an email summarizing information for calendar years 2007 and 2008 comparing amounts of

"RADV exposure" to the "surplus" amounts Defendants had paid IPAs. For 2007, Maldonado summarized that "[b]ased on the RADV analysis, there is an exposure of $28.5MM for that year (out of the total of $103MM)." Maldonado further summarized that for 2008 "[b]ased on the RADV analysis, there is an exposure of $29MM . . . out of the total of $103MM)." He suggested that because those calendar years "have been already reconciled/closed," Defendants only seek retention of surplus payments from IPA for the years 2009 and 2010.

59. On August 4, 2010, executives of Defendants held multiple discussions to address the particulars of the plan to withhold payments to IPAs to create a reserve to pay CMS if needed. They also addressed what to say to the IPAs about the plan for reserves, which would include the need to have a reserve in case of a CMS audit, and the view that the reserve funds should come from RAF dollars. Doug Malton, Chief Financial Officer of Aveta, told Valdez and others that the Plans should reserve $27 million from the next quarterly profit-sharing payment to the IPAs and $5 million per quarter thereafter. While the IPAs' proportional share of the surplus resulting from improperly obtained CMS payments was significantly higher, Defendants' senior executives were still concerned that IPAs might defect to competing plans if asked to pay more into the RAF Reserve.

60. During this same discussion, the issue of Defendants not wanting to pay fee for service doctors the newly increased Medicare rates was again addressed. Valdez indicated his view that the rates should be paid.

61. In early August 2010, the IPAs were informed during a meeting of the MSO Advisory Board of the decision to withhold IPA payments to create a reserve. Carlos Vivaldi, Chief Financial Officer of MMM Holdings, told the IPAs that the inflated RAFs submitted to CMS had resulted in approximately $300 million per year in unsubstantiated payments to the Plans. He stated that a portion of future profit-sharing payments to IPAs would have to be withheld to fund the RAF Reserve, in order to have funds available should CMS perform an audit. He advised the group that CMS could go back in time up to three years as part of an audit.

62. Throughout August 2010, Defendants' senior executives exchanged emails addressing analysis of the surplus from 2007 to 2009, about the IPA holdback proposal, and about RAF comparisons.

63. On August 20, Valdez attended a meeting where Defendants' senior executives discussed, among other things, that The Coding Source had been improperly coding patients that need at-home care.

64. On August 31, 2010, Valdez attended a Medical Management meeting. During the meeting, participants acknowledged that Defendants' MSV process was inaccurate. Penelope Kokkinides was adamant that Defendants should continue their current MSV practice. Valdez voiced his opposition to continuing this inaccurate process.

65. Defendants' strategy of seeking and keeping overly high payments from CMS while paying less and withholding funds from providers created tension between Defendants and the IPAs. For example, Defendants were "facing a situation with IPA's" because "a higher RAF was expected" by IPAs in 2010 based on coding and RAF scores submitted to CMS in 2009; but in fact Defendants reported to IPAs a lower RAF for Q1 2010, resulting in lower payments by Defendants to the IPAs. At the same time that the Defendants were requiring the IPAs to contribute millions of dollars to the RAF Reserve, they were telling the IPAs that the Defendants would contribute substantially more to the Reserve than the IPAs. In fact, Defendants contributed little or nothing to the Reserve.

66. In early September 2010, another Monthly Report (updated Coding Unit Dashboard) was distributed to Defendants' senior executives. This Monthly Report added to the previously reported 2010 month-by-month information by updating the report in certain areas.

67. The Compliance & Productivity section of the September Monthly Report indicated, among other things:

      a. that through the end of June, Defendants' Coding Unit had reviewed 4,921 obsolete ICD-9s used in calendar year 2009 submissions to CMS and came up with 3,224 New Compliance Codes to resubmit to CMS;

1        b.     that through sometime in July, The Coding Source had performed

b. that through sometime in July, The Coding Source had performed 93,167 retrospective reviews of member charts relative to calendar year 2009 submissions to CMS and came up with 191,463 New Compliance Codes to resubmit to CMS;

c. that in July and August, Defendants' internal staff had audited 516 calendar-year 2009 MSV member files and found them to have a "Compliance Rate" of 58 percent.

    i. Based on that, the non-compliance rate would be the remainder, or 42 percent.

    ii. The diagnosis codes for these non-compliant files should have been withdrawn from CMS. Had they been withdrawn, CMS payments to defendants would have been lower.

d. that between March and June, The Coding Source had conducted retrospective review of 467 calendar year 2009 medical charts and found a "Compliance Rate" of 31 percent.

    i. Based on that, the non-compliance rate would be the remainder, or 69 percent.

    ii. The diagnosis codes for these non-compliant files should have been withdrawn from CMS. Had they been withdrawn, CMS payments to defendants would have been lower.

e. that in June and July, Defendants internal staff had audited 1,359 calendar year 2010 MSV's for compliance and found that 308 of those were in compliance, but that 1051 were "Sends Back," which on information and belief meant they had to be returned to IPA's because the MSV's did not support the codes and billing factors represented.

68. The Financial Impact section of the September Monthly Report indicated, among other things, that:

///

PLAINTIFF'S FIRST AMENDED COMPLAINT

a. Auditing in January, February, and March by Defendants of calendar year 2010 codes resulted in assuring that "progress notes accomplish with the documentation required" to support the use of high paying critical care codes, and that this auditing resulted in additional revenue to Defendants of $516,896.11;

b. Estimates for January through March by Defendants' internal staff of the number of ICD-9s that Defendants could resubmit to CMV after using different ICD-9 codes would result in additional revenue to Defendants of $1,401,273.89;

c.. that The Coding Source's February through partial July retrospective reviews of 2009 calendar year member charts and recommended New Comp Codes would result in $15,000,000 in additional revenue once those new comp codes were submitted to CMS; and

d. that CMS's RAFs for Defendants for the months January through August were consistently 20 percent or more higher than "MDX" risk adjustment scores for Defendants. For example, for the month of August, MMM and PMC's average RAF with CMS was 1.29, whereas their average for the same time period under MDX was 1.01.

69. Despite ongoing knowledge that they received hundreds of millions in overpayments from CMS, Defendants did not inform CMS that they had received overpayments. This failure to advise CMS not only was a material falsehood when the cherry picked codes were submitted, but also rendered false Defendants' "Attestation of Risk Adjustment Data" forms for the relevant time periods.

70. Instead of notifying CMS of these overpayments, Defendants continued the Chart Review Initiative and making doctors' compensation more closely tied to Defendants' profitability. For example, in a September 8, 2010 email, Penelope Kokkinides provided Rick Shinto a list of highlights that he could report to the Aveta Board of Directors. Her highlights tracked many of the "to do" items Defendants indicated during the April 23,

2010 meeting previously discussed.  Her highlights included:  the initiation of additional RAF "enhancement strategies"; a comprehensive compliance program developed for RAF-MSV reviews; 100 percent MSV compliance reviews; a restructuring of the MSV program; and changing the way physicians are reimbursed.  She also noted they had addressed the issue of "CMS Audit."

71.    During a telephonic CEO conference on September 8, 2010, Shinto indicated his desire to change the language Defendants used in physician contracts to emphasize that Defendants could seek recovery from doctors in the event of an RAF audit.

72.    In September 2010, Defendants' senior executives circulated an "Audit Report" that, among other things, noted Defendant's contractual requirement that IPA's have face-to-face "encounters" with 40% of their respective patients every month.  This contractual requirement bore no relationship to whether a medical need existed to see that percentage of patients but was intended to generate additional medical diagnosis codes in light of CMS's requirement of face-to-face visits.

73.    During a September 9, 2010 Senior Management Meeting attended by, among others, Rick Shinto, Valdez expressed his concern that the company was not adequately policing fraud, waste, and abuse issues.  Valdez was told by those present to keep quiet and that everything was fine.

74.    On October 1, 2010, Senior Management held a meeting in which they discussed, among other things, compliance rate problems related to their methodology in gathering MSVs.

75.    In October 2010, as part of his concern about RAF overcharges to CMS, Valdez recommended that Defendants create an MSV Compliance Department.  To Valdez's knowledge, this suggestion was not followed and no such compliance department was created.

76.    On October 27, 2010, during an MSO Senior Management meeting Montalvo-Orsini noted that RAF scores resulted in 20 to 25 percent of total revenue, that that the

///

information to support the RAFs was not always in the medical charts, and that this was a big problem.

77.    In late October, senior management reviewed a Project Plan addressing the status of various tasks, including the "RAF Initiative" and the "CMS RAF Take Back Exposure," noting regarding the last task that the "hold back implemented at the IPA level."

78.    On October 28, 2010, Valdez spoke with Shinto about continuing concerns that Defendants were overcharging CMS and underpaying fee for service doctors. Shinto indicated that Valdez should stop making such suggestions, saying that Valdez was a "Gringo sent down to work in Puerto Rico to protect Aveta," and should not be looking to protect CMS or the Island's doctors.

79.    In early November 2010, Orlando Gonzalez prepared a presentation for Rick Shinto to give to Aveta Chairman Daniel Straus. As part of that presentation, Gonzalez and Shinto confirmed that as part of "2010 MMM/PMC Quality" The Coding Source conducted 140,000 retrospective chart reviews for 2009 and that Defendants' internal staff audited 72,000 calendar year 2010 MSVs.

80.    Defendants continued to debate the issue of how much to withhold from surplus distributions to IPAs, as they continued to weigh the likelihood of a CMS audit. For example, in a November 2010 email exchange, David Maldonado recognized that Defendants needed to continue to withhold surplus distributions from IPAs to have funds in the event of a CMS audit, but recommended that no withholding occur in the last quarter of the year because that is an "open enrollment" quarter when Defendants were relying on IPAs to increase Defendants patient membership. "[A]s this surplus payment is the only one made during the open enrollment, we think that is a great business opportunity to increase the membership volume through our business commitment with the [IPAs] and specialists." Maldonado suggested for that quarter only that Defendants reduce, or abandon altogether, the holdback and pay the IPAs a much higher amount of money. "[W]e recommend not to withhold from this surplus distribution the RADV reserve. However, we

PLAINTIFF'S FIRST AMENDED COMPLAINT

will be doing [sic] this withhold in the future surplus distributions (February, May and August)."

81. In November 2010, Shinto further directed his subordinates to stop making federally required payments to non-Plan providers for such services as emergency room treatment. Valdez had indicated on several prior occasions that the law required such payments to be made.

82. On November 12, 2010, Valdez again told Richard Shinto that he needed to get more information about the RAF inflation issue.

83. On November 16, 2012, during a meeting of Defendants' senior executives, Valdez again complained about Defendants' limited fraud and abuse prevention practices.

84. On December 9, 2010, Kokkinides circulated another Monthly Report (Coding Unit Dashboard) that added additional information as of approximately December 6, 2010. This Monthly Report showed how much additional revenue Defendants expected to receive through the Chart Review Initiative for the year 2010.

85. The Compliance & Productivity section of the December Monthly Report indicated, among other things:

      a. that through the end of November, the Coding Source had performed 143,072 retrospective reviews of member charts relative to calendar-year 2009 submissions to CMS and came up with approximately 191,463 New Compliance Codes to submit to CMS;

      b. that in September, Defendants' internal staff audited an additional 159 calendar-year 2009 MSV member files and found those files to have a "Compliance Rate" of 67 percent;

          i. Based on that, the non-compliance rate would be the remainder, or 33 percent.

          ii. The diagnosis codes for these non-compliant files should have been withdrawn from CMS. Had they been withdrawn, CMS's payments to defendants would have been lower.

c. that in July, the Coding Source conducted retrospective review of 144 additional calendar year 2009 medical charts and found a "Compliance Rate" for that month of 43 percent;

    i. Based on that, the non-compliance rate would be the remainder, or 57 percent.

    ii. The diagnosis codes for these non-compliant files should have been withdrawn from CMS. Had they been withdrawn, CMS' payments to defendants would've been lower.

d. that through a portion of December, Defendants' internal staff had audited a total of 108,564 calendar year 2010 MSVs for compliance and found:

    i. A Compliance Rate of 60 percent;

    ii. "MSV's approve amount YTD" was 64,682;

    iii. "MSV's rejected amount YTD" was 43,882;

    iv. Based on this information, the 43,882 "rejected" after audit MSVs represent a non-compliant 40 percent of the files audited.

86. The Financial Impact section of the December Monthly Report carries forward additional information covering the remaining months of the 2010 calendar year and gives expected totals for the year. It relates that:

a. for the year, Defendants retrospective reviews of files would result in an additional $183,713,582 from CMS;

b. Defendants incurred $4,343,270 in costs to undertake the retrospective reviews;

c. Defendants will net approximately $179,370,311.48 in additional revenue based on the submissions to CMS;

d. the RAF scores Defendants caused CMS to use in paying Defendants remained high, noting that for September the CMS score for MMM/PMS was 1.28, while the MDX score was only 1.06; and for

October the CMS average was 1.30, while the MDX average was 1.08; and

    e.    as with previous reports, the Financial Impact section only lists areas where revenues to Defendants could be raised, and did not track or identify areas where Defendants had received overpayments from CMS.

87.    In December 2010, Aveta announced that it was increasing its loan facilities by $100 million and using the entire proceeds to pay a dividend to Aveta shareholders. Valdez objected to paying the dividend while the Defendants' potential liability to the government for RAF overcharges remained unaddressed.

88.    As noted above Defendants were keenly aware of their RAF scores, carefully tracking them as part of continuing efforts to get higher and higher scores and the elevated CMS funds that come with them. They not only tracked them in the Monthly Report, but did so in other documents as well. They repeatedly saw in their own records that the Plans' RAFs during the Relevant Period were substantially higher than those of other Medicare Advantage plans serving demographically and diagnostically similar populations in Puerto Rico, in addition to comparable Medicare Advantage plans nationwide. In 2009, for example, Defendants' average RAF was 1.39 according to Defendants' actuarial financial statements, while the RAF for MCS Advantage, a competing Medicare Advantage plan in Puerto Rico whose members had similar demographic and diagnostic characteristics, was approximately 1.10.

89.    CMS published reports showing the average RAF scores of MAOs nationwide for the years 2006 through 2012. CMS's listed RAF scores for MMM and PMC reflect that they were substantially higher than any other MAO in Puerto Rico for the years 2006 through 2012.

90.    Not only were Defendants' RAFs significantly higher than other plans in Puerto Rico, but they were higher than even Defendants had budgeted, with an average budgeted RAF of 1.25 for 2009, as opposed to the 1.39 actual RAF.

///

PLAINTIFF'S FIRST AMENDED COMPLAINT

91. Defendants scheme to obtain and keep inflated CMS Medicare Advantage funds was very profitable. For example, for the year 2009 (according to a Finance Meeting Report updated April 23, 2010), before paying IPAs their "surplus distribution," Defendants' gross margin for Puerto Rico was about $391,779,890. After paying IPAs $64,738,152 million for their role in Defendants' profiteering, Defendants' net margin was $327,041,378. However, these figures do not account for the additional revenue obtained by Defendants through their Chart Review Initiative.

92. On December 13, 2010, less than one week after the dividend was announced, Shinto terminated Valdez's employment without cause or warning.

93. Throughout Valdez's eight months as MSO President, Defendants gave no indication that they would delete or correct the inflated risk adjustment data submitted to CMS, either prospectively or retrospectively. Nor did the Defendants give any indication that they would notify CMS of the fact of overpayment or return any improperly obtained funds to the government.

94. Subsequent to Valdez's termination, Defendants Aveta and MSO refused to pay him the severance to which he was entitled under his employment agreement with MSO unless he signed a general release of claims against the Defendants and their affiliates, agreed not to sue Defendants or their affiliates, and agreed not to make any negative comments about them or their business operations. Valdez did not sign the release, and Defendants have not paid him the severance due under the employment agreement.

95. In a meeting on January 18, 2011, Alba Munoz, the former AVP of Health Care Quality for the Plans and the person at Defendants in charge of the MSV accuracy audits, confirmed to Valdez that Defendants' MSV accuracy audits revealed that about 20 percent of Defendants $2 billion in Medicare revenue was unsupported.

96. In a meeting on January 20, 2011, during a discussion about MMM and PMC inflating RAF scores, Alba Munoz told Mr. Valdez that a CMS RADV audit is her "biggest nightmare."

///

97.     In late March 2011, persons acting at the direction of the Defendants contacted a close friend of Valdez and warned that the Defendants were watching Valdez "like a hawk" and that disclosure of Valdez's allegations could cost the Defendants more than $300 million.

98.     On information and belief, Defendants continued to prepare and timely submit Attestation Of Risk Adjustment Data Information forms as required by CMS for the relevant time periods but did not advise CMS of the information they had indicating they had been overpaid due to significant percentages of the underlying medical records being non-compliant with the ICD-9 forms submitted to CMS.

## CAUSES OF ACTION

### COUNT I: FALSE CLAIMS (31 U.S.C. § 3729)

### (Against all Defendants)

99.     Valdez realleges and hereby incorporates by reference every allegation set forth in paragraphs 1 through 98 of this First Amended Complaint.

100.    Defendants knowingly submitted inaccurate, incomplete, and misleading data to the government in order to raise RAF scores and increase CMS payments.

101.    Defendants knowingly submitted revised and supplemental data to CMS in order to get additional CMS funds, knowing that the data submitted was inaccurate, incomplete and, misleading because it contained only information that would raise RAF scores and payments to Defendants, while Defendants did not advise the government of, or delete, information that would lower payments to Defendants.

102.    Defendants filled out and submitted to CMS false Attestations for the relevant time periods, falsely representing that all information submitted to CMS was accurate, complete, and truthful.

103.    Through ongoing audits and medical chart reviews, Defendants continually knew that they had received overpayments from CMS based on previously submitted ICD-9 Codes that were not supported by the corresponding medical records, yet Defendants

///

failed to notify CMS that they had received overpayments and failed to return any overpayments.

104.   Through the acts described above, the Defendants knowingly violated each of the following subsections of the False Claims Act:

     a.    Knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval (31 U.S.C. § 3729(a)(1)(A));

     b.    Knowingly making, using, or causing to be made or used , a false record or statement material to a false or fraudulent claim (31 U.S.C. § 3729(a)(1)(B));

     c.    Conspiring to defraud the government by submitting false claims, false statements, and failing to return overpayments (31 U.S.C. § 3729(a)(1)(C)); and/or

     d.    Knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (31 U.S.C. § 3729(a)(1)(G)).

105.   The United States government was unaware of the falsity of these claims, records and/or statements made by the Defendants and, in reliance on the accuracy thereof, paid the Defendants for the claims.

106.   Due to the Defendants' conduct, the United States has suffered substantial monetary damages.

COUNT II:  RETALIATORY DISCHARGE (31 U.S.C. § 3730(h))

(Against Defendants Aveta, MSO and Shinto)

107.   Valdez realleges and hereby incorporates by reference every allegation set forth in paragraphs 1 through 98 of this First Amended Complaint.

108.   By terminating Valdez's employment after only eight months without cause or warning, Defendants Aveta and MSO retaliated against him for repeatedly and lawfully asking questions, marshaling evidence, and speaking out against the Defendants' overbilling practices and other violations of law.

109.   After he was terminated, Defendants refused to pay Valdez the severance he was due under his employment agreement with MSO unless he signed an agreement releasing claims against all Defendants and their affiliates and agreeing not to sue or make negative comments about them, which Valdez refused to sign.

110.   Due to the above-described conduct by Aveta, MSO and Shinto, Valdez has suffered substantial damages.

## PRAYER

WHEREFORE, Valdez prays that this Court enter judgment on behalf of the United States and against the Defendants awarding:

a.   To the United States, damages in the amount of three (3) times the actual damages sustained by the United States as a result of the Defendants' violations of the False Claims Act;

b.   To the United States, civil penalties against the Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

c.   To Valdez, the maximum allowed pursuant to 31 U.S.C. § 3730(d);

d.   To Valdez, all expenses, fees and costs incurred in this action, including attorney's fees and costs;

e.   To Valdez, the maximum allowed pursuant to 31 U.S.C. § 3730(h), including special damages, litigation costs, and attorney's fees;

f.   To Valdez and the United States, prejudgment interest at the highest rate allowed by law; and\

///
///
///
///
///
///
///

PLAINTIFF'S FIRST AMENDED COMPLAINT

g.    To Valdez and the United States, all other relief to which they may be entitled
and that the Court deems just and proper.

Dated:  July 21, 2014                          BIENERT, MILLER & KATZMAN, PLC


By: _/s/ Thomas H. Bienert, Jr. /s/_
     Thomas H. Bienert, Jr.
     Attorneys for Plaintiff

REICH RADCLIFFE & KUTTLER LLP
     Marc Reich
     Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, the Plaintiff in this action, by and through its counsel of record, hereby demands trial of this cause by jury.

Dated: July 21, 2014

BIENERT, MILLER & KATZMAN, PLC


By:
_____*/s/ Thomas H. Bienert, Jr. /s/*_
Thomas H. Bienert, Jr.
Attorneys for Plaintiff

REICH RADCLIFFE & KUTTLER LLP
Marc Reich
Attorneys for Plaintiff

PLAINTIFF'S FIRST AMENDED COMPLAINT

# CERTIFICATE OF SERVICE

I, Coleen Grogan, declare,

That I am a citizen of the United States and am a resident or employed in Orange County, California; that my business address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673; that I am over the age of 18 and not a party to the above-entitled action.

That I am employed by a member of the United States District Court for the Central District of California and at whose direction I caused service of: PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732 on the interested parties as follows:

**X**     **BY ELECTRONIC MAIL:** by electronically filing the foregoing with the Clerk of the District Court using its ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

Linda A Kontos
AUSA - Office of the US Attorney
USACAC.Civil@usdoj.gov

**X**     **BY ELECTRONIC TRANSMISSION** - I transmitted a PDF version of this document by electronic mail to the party(s) identified below using the e-mail address(es) indicated

Russell Hayman
RHayman@mwe.com'

Ankur Goel
agoel@mwe.com'

This certificate was executed on July 21, 2014, at San Clemente, California.

I certify under penalty of perjury that the foregoing is true and correct.

_/s/ Coleen Grogan /s/_
Coleen Grogan